# JAMES GRANT *versus* THOMAS, EARL OF SELKIRK
### October 13, 1818

Andrew G. Whitney and William Woodbridge, attorneys for plaintiff.
Solomon Sibley and Henry Whiting, attorneys for defendant.

# [OPINION]

In the Case of JAMES GRANT against the Right Honorable THOMAS, Earl OF SELKIRK; on a motion from the noble defendant to be discharged from his arrest, on the ground of the same having been made, between nine and ten of the clock, on a SUNDAY morning.

Two questions have arisen in this case; first, *whether the arrest on* SUN-DAY *was legal;* and, second, *whether,* if otherwise, *it is competent for this Court to discharge the noble defendant on motion.*

In support of *the legality of the arrest,* it has been contended, by the learned counsel, who have appeared for the plaintiff, that, *at the common law, the service of process, on* SUNDAY, *was lawful;* that the Statute of the twenty ninth year of CHARLES the Second, chapter seventh, prohibiting the execution of process upon SUNDAY, was never in force in this country, unless between the years 1763 and 1783; and that the Statute of the General Assembly of the Territory of the United States North West of the River Ohio, having in view similar objects, is not, now, in force, in the Territory of Michigan.

The learned counsel, who have appeared for the noble defendant, relying on the continuance in operation of the Statute of the North Western Territory, have, in my humble judgment, too hastily conceded the point, *that, at the common law,* the *arrest on* SUNDAY *was lawful.*

The English authorities, on this subject, are very imposing; but, I conceive, on a careful analysis of them, the result, which has been deemed, by the counsel for the plaintiff, inevitable, is far from being so certain.

The most ancient case, that can now be referred to, is that of JOHN MACKALLEY; which occurred in the reign of King JAMES THE FIRST; and is reported by Lord COKE. COKE'S REPORTS, *Part* IX, *Folio 66.*

This is a case *written in blood;* nor is it surprizing that the perseverance of justice, and the feelings of the community, exacted the life of the offender.

But more is decided in this case; or, at least, from the manner of reporting it adopted by Lord COKE, appears to be decided; than the case itself required.

In a judicial decision, the principle will be found to be as correct, as in another branch of learning; that *more causes are not to be assigned than are adequate to produce the effect.*

RICHARD FELLS was a Serjeant of the Mace, in London. On SUNDAY, the eighteenth day of November, in the eighth year of King JAMES the First, being the year 1611, between the hours of five and six of the

clock, at night, he arrested Sir JOHN MURREY, in the name of the King, at the suit of ROBERT RADFORD. JOHN MACKALLEY was a servant of Sir JOHN MURREY; and, being commanded by his master, to *draw*, drew his sword, and thrust RICHARD FELLS with it, giving him a wound, of which he instantly died.

Here it is sufficient to decide THAT THE PARTY OUGHT, AT HIS PERIL, TO OBEY THE OFFICER ARRESTING HIM, IN THE NAME OF THE KING; AND THAT, IF THE PROCEEDINGS ARE ILLEGAL, HE MAY HAVE HIS ACTION OF FALSE IMPRISON-MENT.

| | |
|---|---|
| 2. Bulstr. 65. | Godb. 403. |
| 4. Coke 40. 41. | Hal. Pl. Cor. 41. 45. 46. 345. |
| 5. Coke 92. | 1. Hawk. P. C. 128. |
| 6. Coke 54. | 3. Inst. 52. 56. |
| 9. Coke 61. 65. 66. 68. 69. | Jenk. Cent. 291. |
| 10. Coke 76. | Latch 223. |
| Cro. Car. 183. 371. 538. | Moor 767. |
| Cro. Eliz. 164. | 2. Roll 493. |
| Cro. Jac. 3. 280. 485. 486. | Sav. 63. |
| | Sum. 45. 46. |

But to decide THAT ALL MINISTERIAL ACTS MAY BE LAWFULLY EXECUTED ON THE SUNDAY; THAT ALL PROCESS, CIVIL AS WELL AS CRIMINAL, MAY BE SERVED ON THAT DAY; is to decide more than was necessary to justify the execution of MACKALLEY, more than the case under adjudication required, and, as I humbly conceive, what was in contravention of the Common Law, at that æra.

The original SUNDAY, regarded by Christians, assumes it's date from the fifth day of April, in the year thirty-three, of the existing æra.

On that day, the SAVIOR of MANKIND arose from the dead; and, on that day, he appeared to his disciples, and received their worship.

The first evidence of it's recurrence, as a day of religious assemblage and worship, is afforded in the twenty-sixth verse of the twentieth chapter of the Gospel of Saint JOHN.

It's recurrence again appears in the second chapter of the ACTS of the APOSTLES; for, on comparing the text of it's first verse with that of the sixteenth in the twenty-third chapter of LEVITICUS, there cannot remain a doubt that the PENTECOST, or *fiftieth* day, when the Apostles *were*, thus, *all* assembled *with one accord, in one place*, was SUNDAY.

It's further observation and recurrence are proved, by Saint LUKE, in the twentieth chapter of the Acts of the Apostles; and, by the Apostle PAUL, in the sixteenth chapter of his primary epistle to the Church of Corinth.

434

That SUNDAY had, at a very early period, acquired its appropriate appellation of CYRIACA HEMERA, DOMINICA DIES, or THE LORD'S DAY, is manifested by the Apocalypse.

Saint JUSTIN, one of the earliest philosophers of Heathen antiquity converted to Christianity; who attested with his blood the sincerity of his faith, and who lived within a century from the first SUNDAY; notices the regular observance of the day, in his time. He assigns, as a reason for the observance of Sunday, the circumstance of its being the first day of the creation of the world; in addition to its being the day of the resurrection of the Savior.

The Fathers DENIS, CLEMENS of Alexandria TERTULLIEN, CYPRIAN, AUGUSTIN, attest the continuance of this Christian observance; and bring down the evidence even to the fifth century.

The primitive Christians, notwithstanding their selection of this day for public worship, yet, in other respects, used all days alike; making no exception in favor of Sunday.

They proceeded, even, one step farther.

They gave a PREFERENCE to Sundays, for *judicial* transactions.

For these practices they had two reasons.

The first was, in order to mark, with greater precision, the line distinguishing Christianity from Paganism. The Heathens were *superstitious* observers of days and times; regarding some as peculiarly ominous and inauspicious, and others as of an eminently opposite character. The Christians laid aside ALL superstitious observance of days.

The second was, by keeping the tribunals among Christians ALWAYS open, to relieve Christian suitors from the necessity of repairing to the Heathen Courts.

The first recognition of Sunday as one of the Roman FERIAE, or HOLIDAYS, took place under the Emperor CONSTANTINE, in the year 321.

In that character, it became distinguished as a day of exemption from *ordinary labor*, and from *pleadings in courts of justice;* nor is it, in the slightest degree, improbable that it was, then, accompanied with the personal privilege of *protection from arrest, in civil cases.*

For the imperial constitution of THEODOSIUS, the Younger, whose reign terminated in 450, beginning "UT IN DIE DOMINICO," and which was itself made in confirmation of the previous constitution of the Emperor CONSTANTINE, beginning "SICUT," recited in the Theodosian Code compiled in the year 438, under the title "DE FERIIS," and in the Justinian Code, compiled about the year 533, under the same title, contains the following enactment: "SOLIS DIE OMNIUM, OMNINO, LITIUM ET NEGOTIORUM QUIESCAT INTENTIO:" "ON THE SUNDAY, LET

THE BRINGING OF ALL SUITS, AND CASES AT LAW, BE, AL-TOGETHER, SUPPRESSED."

And the Emperior LEO, whose reign terminated in the year 474, January the twenty sixth, and the Emperor ARTHEMIUS, his contemporary, in the law preserved in the Code of JUSTINIAN, numbered eleven, beginning "DIES FESTOS," and under the title, "DE FERIIS," or, "CONCERNING HOLIDAYS," forbade *the making of any executions, or PURSUITS, for debts, whether of a private or of a public nature,"* on those Holidays; *"willing,"* as the law expresses it, *"that all affairs, and all INSTRUCTIONS* "OF PROCESS, *should cease; that the OFFICERS OF JUSTICE should* "dwell in REST, *and in SILENCE; and that the PARTIES should enjoy* "PEACE, *in that interval, in order that they might MEET TOGETHER* "WITHOUT FEAR, *and, without relaxing the sanctification of the day, con-* "fer upon reconciliations and arrangements."

And the enactments of THEODOSIUS, and of LEO, are, evidently, not new and original laws; but, obviously, re-enactments and enforcements of preceding regulations.

This observation of Sunday in the character of a Public Holiday recognized, under the authority of the State, as a day of general exemption from *labor,* and from *civil process,* and as, therefore, emphatically, a *dies non juridicus,* soon received the sanction of the Ecclesiastical or Canonical Law; and was confirmed by a succession of Councils, reaching even to modern times.

In the year 517, a canon appears, probably from a Council held under the Emperor ANASTASIUS the First, prohibiting *the adjudication of causes on Sunday.*

This is followed by several others.

The Council of Meaux, in the year 845, forbade *the taking of an oath, in justice, in a civil case,* on Sunday.

The Council of Tribury, about the year 895, in terms which will, presently, be exactly quoted, inhibited secular dignitaries from coercing popular attendance on Sundays.

A canon against secular pleas on Sundays was made by the Council of Erpfurd, in the year 932, and enlarged by the Council of St. Medard.

These canons became general, and were taken into the body of the Canon law, by GRATIAN, about the year 1151.

Pope GREGORY the Ninth, who was elected in the year 1227, having been consulted, if it should be permitted to *execute acts of justice* on Sunday, decided that neither *process,* nor *judgment,* could be sustained on that day; *not even by consent of parties.*

The fourth Canon of the Council of Bourges, in the year 1584; a Council which had been preceded, in similar regulations, by that of Tours, in 1583;

and those, by that of Milan, in 1573; uses a language which is very comprehensive and expressive. "DOMINICO DIE CESSENT SAECULARIA OPERA, CESSENT LICTORES, SILEAT PRAECONIS TUBA, CONTRACTUS, NOTARIORUM INSTRUMENTA; NISI QUAE EX NECESSITATE TESTAMENTORUM, AUT MATRIMONIORUM CAUSA, DIFFERRI NON POSSUNT." "*On the Lord's Day shall cease secular operations, shall cease the executive officers of justice, shall be silent the trumpet of the Crier. Contracts, and Notarial instruments,*" shall not be made; "*excepting those which, from the necessity of Wills, or on account of Marriages, cannot be deferred.*"

The civil authorities, on the rise of the Feudal Thrones, will be found advancing, with a step alike regular and firm, in the same career.

CHILDEBERT, king of France, in the year 554, enjoins his subjects honorably to celebrate the Sundays and Holidays commanded by the Church; adopting, nearly, the language of CONSTANTINE, on that subject.

By an ordinance given at Mâcon, in the year 585, GONTRAN, King of Burgundy, commanded that *all pursuits of process shall cease on Sunday.*

The Emperor CHARLEMAGNE, by an edict of the year 813, expressly prohibited "*pleadings from taking place, or judgment of death, or of any other punishment, from being rendered on Sunday.*"

The Emperor LOUIS the First, the son and the successor of CHARLEMAGNE, whose reign terminated on the twentieth day of June, in the year 840, repeats the same capitular.

These two emperors adopt the very words of the first Canon referred to, that of the year 517.

It remains to enquire how far the regulations of CONSTANTINE, adopted by the Canonical Law, and thence transferred to the Civil Codes of Christendom, are ingrafted into the Common Law of England; and then, more particularly, to examine whether *an arrest, on civil process, on Sunday,* be an infraction of that law.

That system of regulations and enactments, which bears the grand, and widely circulated, appellation of "THE COMMON LAW," receives its date from the third day of September, in the year 1189.

On that day, being the epoch of the coronation of RICHARD Coeur de Lion; and the first monarch of the name of RICHARD on the English throne; the "COMMON LAW" became complete, and insusceptible of any additions.

The Common Law is composed of the *unwritten,* and of the *written,* law of England, anterior to that æra.

The first Christian monarch in England was ETHELBERT King of Kent. He espoused BERTHA, daughter of CHARIBERT, King of Paris.

On her invitation, Saint AUGUSTINE, with forty associates, was delegated, from Rome, by Pope GREGORY the First, to convert Britain to Christianity; and he succeeded in the mission. This event took place about the year 596.

The Christian religion always implies, produces, and sustains, civilization and learning; and the Common Law, anterior to this æra, could not have begun to assume a written form; since the English were, previously, without an alphabet. What we possess of it may thus be considered as matured by a regular growth of six centuries.

Until the reign of King HENRY the Eighth, which terminated in the year 1547, England continued a Roman Catholic country. The Christian religion, in the form then bearing the denomination of the Catholic, the Apostolic, and the Roman, was a part of the Common Law. The civil law was, in its primary stages, identified with the ecclesiastical law; and the whole administration of civil justice, in England, was, originally, in the hand of ecclesiastics.

In England, accordingly, the Canons made by the early Councils, respecting the observation of Sunday, and the other Holidays, were received, and were implicitly adopted, by the Saxon, and by the Danish monarchs.

King EDWARD, the elder, the son of ALFRED the Great, who succeeded to his throne in the year 900; and who, imitating the wise policy of his father, in erecting the University of Oxford, founded that of Cambridge; with a view to enforce the Canonical Law, and the regulations of the Church, prohibited, expressly, "ALL PROCEEDINGS IN LAW," on the Canonical Holidays.

King CANUTE, the Dane, a century later, having secured his triumphs over the Saxon dynasty, used the precaution to re-enact, in express words, the previous regulations of King EDWARD, the elder.

EDWARD the Confessor made the following constitution: "PAX DEI, ET SANCTAE ECCLESIAE; PER OMNE REGNUM, OMNIBUS SABBATIS, AB HORA NONA, ET TOTA DIE SEQUENTI, USQUE AD DIEM LUNAE, &C." "THE PEACE OF GOD, AND OF HOLY CHURCH," shall be maintained, "THROUGHOUT THE WHOLE KINGDOM, ON EVERY SATURDAY, FROM THREE OF THE CLOCK IN THE AFTERNOON, AND DURING THE WHOLE OF THE SUCCEEDING SUNDAY, UNTIL MONDAY."

These Canons and Constitutions were all confirmed by WILLIAM the Conqueror, and by HENRY the Second, the immediate predecessor of RICHARD the First, surnamed Coeur de Lion; "AND SO," to use the precise words of Lord MANSFIELD, as reported by Sir James BURROW in the case of SWANN and BROOME, "BECAME PART OF THE COMMON LAW OF ENGLAND."

The latter of these monarchs, HENRY the Second, expressly extended the canonical regulations, respecting the sanctity of the Lord's Day, into the Forest Laws.

By the laws and ordinances of the POURALLEES, a term afterwards modernized into *purlieus*, made in the thirtieth year of King HENRY the Second, or in the year 1184, at Woodstock, and commonly called the Assizes of Woodstock, it is enacted that "no Pourallee-Man may hunt on the Lord's Day, commonly called Sunday; for that is wholly appropriated to the service of Almighty God, and, by his Laws, appointed to be kept holy, and not be prophaned by using or doing any worldly business therein."

Under the reign of King EDWARD the First, about the year 1275, several alterations and relaxations, with respect to days to be observed, and the manner of observing them, were introduced.

In the reign of EDWARD the Third, about the year 1377, a clergyman, on any day, was privileged from arrest in going to the church, and in returning, and while engaged in performing divine service. This regulation was afterwards fortified in the reign of Queen MARY, about the year 1554.

A Statute, passed in the reign of HENRY the Sixth, about the year 1449, particularizes Good Friday, as one of the Holidays to be observed with the same solemnities as Sunday.

At the dawn of the Reformation it was enacted, in Parliament, *"that the Canonical Law should still be used and executed."*

As the Reformation advanced, not a little vacillation was manifested, both with respect to the number of the true Holidays, and with regard to the manner in which they ought to be observed.

In a Statute of EDWARD the Sixth, about the year 1553, the Holidays were recited; and, including the Sundays, the days of the Saints, and the Vigils, they amount to *one hundred and fifteen days in the year*. They were afterwards reduced to about *one hundred*.

King JAMES, the First of Great Britain, in whose reign the existing United States of America were colonized, June the 26th 1607, issued, in the year 1618, a proclamation allowing of sports on Sundays, after divine service; and it was the policy and practice, both of that reign and of the succeeding, to encourage them.

While the Roman Catholics multiplied Holidays, and often celebrated them with a portion of positive festivity; the Lutherans admitted many in addition to the Sundays, and generally observed them all with a degree of ease, and of sociability. The Calvinists, on the other hand, were inclined to limit the sacred days to the Sundays, and to observe those with a peculiar sanctitude; regarding any degree of unnecessary labor, of festivity, or of amusement, as amounting to a profanation. The Puritans not only invested the DAY of the LORD with the rigorous quietude of the Jewish

SABBATH; but were, even, disposed to reduce the time of its commencement and close to a conformity with the Levitic ritual. "From even unto even shall ye celebrate your Sabbath."

The original regulations of CONSTANTINE, and afterwards the Statutes of England, excused from their operation, respectively the laborers of harvest.

At length the Britannic Statute, made in the reign of CHARLES the Second, in the year 1677, definitively settled the civil character of Sunday, in relation to the British dominions; and from this source have emanated those American Statutes, on the same subject, a temporary suspension in the operation of one of which has given origin to the question, that has just been agitated with such animation.

The total inhibition of judicial proceedings, including, in express terms, *exemption from arrest in civil cases;* the suspension of the ordinary labors of the community; and the tranquil protection of religious assemblies; compose the principal general features, constituting the civil characteristics of the *Sunday*, in the United States of America.

In order to determine whether, without the intervention of a statutory enactment, exemption from civil arrest, on Sunday, existed at common law, it becomes, now, necessary to find the correct construction of the terms "PAX DEI ET SANCTAE ECCLESIAE"; *"The Peace of God and of Holy Church."*—If arrest, on civil process, on Sunday, be an infraction of that "PEACE," the exemption exists.—If it be not inconsistent with this "PEACE," arrest, on Sunday, will be legal.

To ascertain the correct construction of the terms, "Pax Dei et Sanctae Ecclesiae" "The Peace of God and of Holy Church," it is obvious that the interpretation must be sought from the canonical or ecclesiastical documents and writers, in preference to all others; and particularly from those of the contemporary or vicinous ages.

The Councils, the Popes, the Roman Emperors, the distinguished and celebrated Theologians, BABIN, CABASSUT, COLLET, NAVARRE, PONTAS, SOTO, TOLET, all maintain a uniform and consistent tenor; and such as is little liable to any misapprehension.

Minute references to some of these documents and writers, and others, will be found in the subjoined list of authorities.

I do not here recite these authorities because they are so numerous; and the list of them is constructed in a manner similar to that before presented.

From the canonical documents and writers, the following facts, principles, and doctrines, are deduced.

All acts of civil justice, which were founded in FORCE, which were attended with any degree of violence, with contention, with disturbance, with noise, with tumult, were deemed a violation of "the Peace of God and of

Holy Church"; and, as such, were inhibited on Sundays, and on other days regarded as holy. "Debet judicialis strepitus conquiescere"; are the words of Pope GREGORY. "Let the sound of judicial proceedings be hushed."

The following are the words of BABIN, Dean of the Faculty of Theology at Angers, in France; in his Ecclesiastical Conferences of that Diocese, as reduced by the order of Bishop VAUGIRAULD. "On ne doit faire aucun différence, entre l'obligation de sanctifier les Fêtes, et l'obligation de sanctifier les Dimanches." "No distinction must be made between the obligation of keeping the Sundays holy, and the obligation of keeping the other Holidays holy." He adds that the Popes and the Councils make no such distinctions; nor the Princes, when they make laws obliging their subjects to perform what the church has ordained, respecting the celebration of Holidays. No distinction is made between Sundays and the other Holidays in the law, reported by Eusebius, in his life of Constantine; none in the ordinance of Childebert, King of France; none, as to Sabbaths, in the book of Nehemiah.

Extraordinary assemblages of the people, on Sunday, at any other places than the church, or having their origin in any other than religious purposes, were deemed a violation of that "peace," which the ecclesiastical law requires. "Nullus comes, nullusque omnino secularis, Diebus Dominicis, placitum habere, sed nec populum illo praesumat cohercere;" is the language of the Canon, made in the Council of Tribury. "No Count, no merely secular person, shall be allowed to hold pleading, nor presume to coerce the attendance of the people on him, on Sundays."

Even the administration of an oath, on Sunday, was deemed a violation of its peculiar quietude. "Decrevit Sancta Synodus ut, in Diebus Dominicis, nullus supra Sacra Evangelia jurare praesumat;" is the language of the Council of St. Medard. "The Holy Synod has decreed, that no one shall presume to swear upon the Holy Evangels, on Sundays."

"Tous les actes de Justice, qui se font avec bruit et contention, sont defendus, les Dimanches, et les Fêtes." This is the language of the "Conferences of Angers." "All acts of justice, which are attended with noise, and contention, are forbidden, on Sundays, and Holidays." The proceedings of the Palace, as they are termed, turn away the faithful from the worship of God, and works of piety. The Justinian Code ordains that, on Sundays and Holidays, "the noise of the palace shall be made to cease." It forbids "pleading" on those days. In 845 the Council of Meaux, as has been already stated, forbade oaths on Sunday.

"Le Concile de Bourges vent que les Huissiers, et les Sergens, s'abstiennent, tout-à-fait, de leurs fonctions, les jours de Dimanches." "The Council of Bourges desires that Bailiffs and Serjeants abstain altogether, from their functions, on Sundays."

"Vetant leges plurimae, ne, diebus festis, habeantur strepitus forenses; imo, quidquid fit, tunc temporis, judicialiter, ipso facto, irritum est." "Many laws prohibit the bustle of forensic business on Holidays. Nay, whatever is done, at that time, judicially, is ABSOLUTELY void." This is the language of the "Institutiones Theologicae," of Collet.

"Les Gens de Justice doivent s'abstenir de tous jugemens, et procédures du Barreau; afin que les Fidéles ne soient point distraits, par le soin des affaires temporelles, de l'application avec laquelle ils doivent s'occuper de Dieu et de ce qui regarde leur salut." "The People of Justice ought to abstain from all judgments, and proceedings of Court, in order that the Faithful may not be at all distracted, by the care of temporal affairs, from the application with which they ought to occupy themselves with God, and with what regards their salvation." These terms are extracted from the celebrated "Dictionary of Cases of Conscience, or Decisions of the most considerable difficulties touching Morality, and Ecclesiastic Discipline, drawn from the Scriptures, the decrees of Councils and Popes, the Fathers, and the most celebrated Theologians and Canonists," by Monsieur PONTAS.

Many acts, connected with the administration of justice, and of political concerns, which were unattended with *violence*, were permitted by the Ecclesiastical, or Canon Law, on Sundays.

The execution of a Will, by a sick person, was permitted.

Contracts of marriage were lawful.

It was permitted to take possession of a benefice.

The enfranchisement of slaves, being regarded as an act of charity and mercy, was lawful, on Sundays.

The election of officers, to sustain a public charge or trust, was lawful on that day.

The deliberations of the Parochial Assemblies were usually held on Sundays, after the celebration of Mass; on account of the difficulty of assembling the people on work-days.

The oppositions and protestations of parties interested were also received, on that day, against the acts of such assemblies.

Citations were generally published on that day, or delivered after the celebration of divine service; and, accordingly, in England, at this day, it is lawful to publish or deliver a citation, emanating from an Ecclesiastical Court, on Sunday.

Advocates might attend, on that day, out of the hours of divine service, to professional concerns, "excepté celles qu'ils ne peuvent faire qu'avec le bruit du Palais, qui doit être fermé en ces jours," say the "Conferences of Angers:" "excepting those which cannot be made without the *noise of the Palace, which ought to be shut on that day:*" that is to say, when converted into the correlative language, applicable to our republican institutions,

*excepting those which require the intervention of civil magistrates and officers, whose functions must rest on that day.*

These are some of the transactions permitted on Sunday by the Canonical Law.

But games, Theatrical exhibitions, those of the Circus, combats of animals, fencing, spectacles, shows, gaging stocks, plays, sports, feats of activity, frolics, profane music, fortune-telling, fowling, fishing, frequentation of inns, taverns, and drinking-houses, pleasure-parties, luxury, debauchery, and, generally, all profane diversion; traffic, dances, hunting, public entertainments, and a variety of other abuses; relics of Paganism, which have been introduced into some Roman Catholic countries and others; are, entirely, contrary to the Ecclesiastical Law.

Such is a faithful representation of the doctrines and expositions of the Canonical writers, relative to the *peace of God and of Holy Church;* and the consequent quietude of the Christian Sabbath.

Nor did the DAY OF THE LORD alone, but the HOUSE OF THE LORD also, according to the Canonical Law, extend its protecting aid against the pursuits of justice. Dire necessity might, indeed, yield to the civil arm some dreadful offenders; but generally the *altar*, and the *temple*, served as the ultimate asylum, even to criminals of the deepest die.

A particular examination whether an arrest, on civil process, on SUNDAY, be an infraction of this *peace of God and of Holy Church*, insisted on by the Canonical Law, will, of course, close the present branch of this enquiry.

Arrest is the seizure of the person, in order to coerce response to a plaint. It is, in its nature, *an act of force.* The force *may*, and when requisite *must*, be actually exerted; and, when no actual force exists, the law implies it.

The defendant, when arrested, must either be conducted and committed to prison, or put in bail. The method of putting in bail is by entering into a bond or obligation, with one or more sureties, to guarantee the appearance of the defendant at the return of the writ.

When reason alone is competent to solve a moral question, it is a right, it is a duty, it is one of the attributes of the human mind, with which it is invested by the Creator for the wisest purposes, to rely on its dictates, independently of extrinsic authority.

It is also a sound rule in the illustration of any law, that the main object which it has in view is to be regarded as the principal guide in its construction. The previous state of the law, as it would have subsisted without the new enactment, is, therefore, to be first adverted to; the evil intended to be remedied is to be next contemplated; and, lastly, the remedy is to be considered which has been provided to relieve against this evil. It is the duty of those, who are called to judge of the law, so to construe it, as at once to obviate the evil, and to advance the remedy.

Now what was the object intended to be effected by rendering SUNDAY an injuridical day?

Was it not to promote the worship of God in universal tranquillity?

The object of the inhibition is to free the mind from the cares, the business, and the affairs of the world; to divest it of fear; to fill it with peace; and to enable it to turn its undiverted attention to the worship of the Deity.

Now the mere formality of ordering the suit, or preparing any papers or writs relating to it, is not that which gives to the mind of the defendant the disturbance contemplated to be guarded against.

It is the *service of the process* which has this effect. It prevents the defendant from repairing to the public worship of the Deity, or takes him from the House of God to the Prison, or requires him to seek for, and to obtain, surety to appear, and to answer the complainant.

To prevent a person from repairing to the public worship of the Deity, to take him from the bosom of the church, in the act of divine service, to oblige him to apply and search for bail, to require from him, and them, the execution of a bail-bond, or, otherwise, to drag him to a prison, and to confine him therein — these acts make that tumult, that violence, that din, that disturbance, that *strepitus*, that violation of the *peace of God and of the holy church*, which is so odious in the eyes of Christians, on the day respected by them as so peculiarly sacred.

Reason, therefore, is amply adequate to pronounce, that arrest, on civil process, on SUNDAY, is totally inconsistent with the object, the spirit, and the intention, of the enactment.

But the aid of express and plain authorities is abundant, to fortify, and to confirm, the inference.

The expressions used by the Roman Emperors, by the Popes, by the Councils; the interpretations given by the civilians, and by the theological writers and expositors; are plain enough not to be susceptible of mistake, misapprehension, or misconstruction.

*Intentio litis*, or *negotii*, in the language of the Romans, as we are informed by Cicero, and by Quintilian, signifies *to commence a suit against a person*; as *depulsio* signifies to *defend it*, or to *plead not guilty*.

The enactment, therefore, of the Theodosian statute is as broad, and as express, as language can make it. "*Solis die, omnium, omnino, litium et negotiorum quiescat intentio.*" "On the day of the Sun, let the bringing of all suits and actions at law be, entirely, suspended."

So the Justinian Code inhibits, among other things, *pursuits for debts*, whether public or private, and all suits and preparations of process, and prescribes to the executive officers of justice absolute *rest* and *silence;* and expressly designates the object of its injunctions to be, that the parties, on the sanctified day, may *enjoy peace*, and *assemble without fear*.

So, also, Pope Gregory forbids, even that the consent of parties shall justify the *service of process* on SUNDAY.

Thus, too, the language of the Council of Bourges plainly implies that an officer cannot serve process, and that a contract, or bail-bond, cannot be lawfully executed, on SUNDAY. "Cessent saecularia opera, lictores, contractus, notariorum instrumenta."

The ordinance of the King of Burgundy prohibits *pursuits of process* on Sunday.

The forensic *strepitus*, judicial assemblages, the administration of oaths, pleadings, judgments, acts attended with noise or with contention, are particularized, as we have seen, by the Councils, and by the Canonical expositors, as inconsistent with the quietude of Sunday; and bailiffs, serjeants, and officers of courts, are, pointedly, enjoined, on that day, to *abstain altogether from the exercise of their functions*.

Lastly, the THEOLOGICAL INSTITUTIONS declare that whatever acts relating to justice are done on Sunday are absolutely void. "Imo, quidquid fit, tunc temporis, judicialiter, ipso facto, irritum est."

I am, therefore, of opinion, according to the most luminous authorities which I can obtain, and from the best judgment which I can form, that arrest, on civil process, was not, at the Common Law, legal on Sunday.

The statute of Charles the Second appears to me to be an enactment of the previous Common Law, so far as it relates to this particular point.

It is not surprizing that in the struggle between the Protestant and the Roman Catholic interest, in England, the Common Law, on these subjects, should have been somewhat disturbed; nor that an express statutory provision, to regulate them, should have become requisite.

The English law writers, reposing an implicit reliance on the *dictum*, given in the case of Mackalley, have treated this question with unusual carelessness. Hence the latitude of assertion in Croke, Comyn, and other eminent juris consults of England, that "*ministerial acts might, at common law, be legally executed in the Sunday.*" The question indeed had become, by the statute of Charles, divested of all interest; nor is it by a co-incidence of events the least singular and surprizing, that it has suddenly acquired so much importance, at this time, and in this country, in the case of the Earl of Selkirk.

Deeming *arrest, on civil process, illegal on Sunday, at common law*, I am not bound to approach any of the ingenious questions which have been raised relating to the local statutes. It may be conceded that the English statute, and that the statute of the North Western Territory, are repealed by the law of the sixteenth of September 1810, entitled "An Act to repeal all acts of the Parliament of England, and of the Parliament of Great Britain, within the Territory of Michigan, in the United States of America,

and for other purposes;" and, yet, the arrest of the Earl of Selkirk, on Sunday, will not remain legitimate at the Common Law.

The following is as correct a reference as I have been able to make to various authorities establishing, supporting, and illustrating, the principles, the doctrines, and the facts, adverted to in the preceding part of this investigation; relative to SUNDAY, and the Sabbath, generally.

They are alphabetically arranged

Acts. c. 1. passim. c. 2. v. 1. c. 13. v. 14. 27. 44. c. 15. v. 21. c. 18. v. 4. c. 20. v. 7. 16.

Ainsworth's Lat. Dict. in verbis, *Depulsis, Intentio Negatium.*

5 Ann. c. 9.

Asylum. 1 Gregory 179.

1 Atkyns. 55.

Babin. 347. 408.

4 Bacon. 456.

Belsham's Review of Wilberforce 20. 133. 139. 140. 141. 142. 203.

1 Blackst. Comm. 64. 65. 66. 67. 68. 69. 70. 71. 72. 73. 79. 80. 82. 83. 87.

3. Blackst. Comm. 61. 63. 277. 289.

4. Blackst. Comm. 59. 401. 402. 403. 404. 405. 408. 420.

1 Bl. Rep. 499. 526.

2 Bl. Rep. 1273. 1314.

1 H. Bl. 628.

Britton. c. 53.

2 Bulst. 72.

3 Bulst. 206.

3 Burrow 1595, 1596, 1597, 1598, 1599, 1600, 1601, 1602.

Buxtorf. Judaica Synogoga. c. 10. 12.

1 Car. I. cap. 1.

3 Car. I. cap. 4.

29 Car. II. c. 7.

Cawley 78.

Cicero. Intentio.

5 Coke 83.

8 Coke 127.

9 Coke 66. b.

Co. Litt. 135.

Collet. 167. 168. 169. 170. 171. 172. 173. 174.

Coloss. c. 2. v. 16. 17.

6 Comyn, 317. 318. 319. 320. 321.

Conférences Ecclésiastiques du Diocése d'Angers. 347. 407. 408. 409. 410. 411.

1 Cor. c. 11. v. 18. 20. c. 16. v. 1. 2.

Cro. Car. 602.

446

Cro. Jac. 16. 279. 280. 496.

Cro. Eliz. 227.

Cyriaca Hemera, Greek Original, Rev. c. 1. v. 10.

2 Dall. 213.

Deuteronomy, c. 5. v. 12. 13. 14. 15. c. 16. v. 9. 10. 11. 12. 13. 14. 15.

Dictionnaire des Cas de Conscience de M. Pontas. 415. 416. 417. 418. 419. 420. 421. 422. 423. 424. 425. 426. 759. 760. 761. 762. 763. 764.

Digest of the Laws of the Territory of Michigan, by Governor Cass, Title, REPEALING ACTS, pages 119. 120.

Dominica Dies. Vulgate. Rev. c. 1. v. 10.

Dugd. Cr. J. 89. 90.

Dyer, 168.

Ecclesiastes, c. 3. v. 4.

3 Edw. I. c. 51.

50 Edw. III. c. 5.

12 Edw. IV. 8. b. pl. 22.

6 Edw. VI. c. —.

1 Eliz. c. 1.

Encyclopaedias; articles Asylum, Lord's Day, Sabbath, Sunday.

18 Enc. Brit. 417.

2 Esp. 227. 228. or 604. 605. Evidence 409. 539. N. P. Ca. 99.

Esther, c. 9. v. 17. 18. 19. 20.

Eusebius, Life of Constantine, Lib. 4.

Exodus, c. 12. v. 14. 15. 16. 18. 19. 20. c. 13. v. 6. 7. c. 16. v. 22. 23. 25. 26. 27. 29. 30. c. 20. v. 8. 9. 10. 11. c. 23. v. 12. 15. c. 31. v. 13. 14. 15. 16. 17. c. 34. v. 21. 22. c. 35. v. 3.

Ezekiel. c. 18. v. 5. 9. c. 20. v. 10. 11. 12. c. 22. v. 8.

Fitz-Herb. Nat. Brev. 36.

Garth 504.

Genesis, c. 2. v. 2. 3. c. 7. v. 4. 10. c. 8. v. 4. 10. 12. c. 29. v. 18. 20. 27. 28. 30.

Godb. 280.

Hal. Hist. C. L. 102. 162.

Hale's Pl. Cor. 45.

1 Hawk. P. C. 11.

Hebrews, c. 4. v. 4.

27 Hen. VI. c. —.

25 Hen. VIII. c. 19.

Index, Chronological, to Eyre and Strahan's Bible, London, 1772. Year *after* Christ 33. misprinted *before*.

Index to the Holy Bible. Oxford. Dawson, Bensley, and Cooke. 1800. Year after Christ 33.

2. Inst. 220. 264. 265.

4. Inst. 259.

Institutiones Theologicae, 167–174.

Iremaeus. sabbatizat.

Isaiah, c. 56. v. 2. 4. c. 58. v. 13. 14. c. 66. v. 23.

Jenk. Cent. 291.

Jeremiah. c. 17. v. 21. 27.

John, c. 5. v. 9. 10. 16. 18. c. 7. v. 22. 23. c. 9. v. 6. 7. 14. 15. 16. c. 19. v. 21. c. 20. v. 1. 8. 9. 14. 15. 16. 17. 18. 19. 20. 21. 22. 25. 26. 27. 29.

Johnson, History of the English Language. In Principio Dict. Verb. Easter.

3 Johnson's Reports 157. 261. 4 Johns. Rep. 45.

6 Johns. Rep. 121. 326.

1 Jones, 156.

Joshua, c. 6. v. 3. 4. 11. 14. 15.

Leg. Athelstan.

Leg. Edw. Conf. c. 9.

LL. Edgar, c. 5.

Lempriere; Articles, ANASTASIUS I., ARTHEMIUS, CONSTANTINE, JUSTINIAN, LEO I., THEODOSIUS.

1 Lev. 328.

Leviticus, c. 19. v. 3. 26. c. 23. v. 2. 3. 8. 10. 11. 15. 16. 17. 21. 24. 25. 27. 28. 32. 34. 39. 40. 41. 42. c. 25. v. 2. 3. 4. 5. 6. 7. 8. 9. 10. 11. 12. 13. 20. 21. 22. c. 26. v. 34. 35.

Lord's Day. King James's Bible. Rev. c. 1. v. 10.

Luke, c. 4. v. 16. 31. c. 6. v. 1. 2. 5. 6. 7. 9. c. 13. v. 10. 14. 15. c. 14. v. 1. 3. 5. c. 24. v. 1. 3. 6. 13. 15. 21. 23. 31. 33. 34. 35. 36. 39. 40. 43. 46. 47. 48. 51. 52.

1 Maccab. c. 1. v. 43. 45. c. 2. v. 32. 34. 38. 41. c. 4. v. 59. c. 10. v. 34.

2 Maccab. c. 5. v. 25. 26. c. 6. v. 6. 11. c. 15. v. 1. 2. 3. 4.

Mad. 551.

Magee on Atonement. 63. 64. 470. 471.

Manwood's Forest Laws Abridged. 50. 58. 64. 67.

1 Mar. s. 2. c. 3.

Mark, c. 2. v. 23. 24. 26. 28. c. 3. v. 2. 4. [c.] 6. v. 2. c. 16. v. 1. 2. 6. 9. 12. 14. 19.

Matthew, c. 12. v. 1. 2. 5. 8. 10. 11. 12. c. 28. v. 1. 6. 7. 9. 10. 16. 17. 18. 19.

Mirror of Justices. Art. 111.

Mod. Ca. 148. 159. 196. 231.

5 Mod. 95. 449. 450.

6 Mod. 95.

Nehemiah, c. 8. v. 1. 2. 3. 9. 10. 11. 12. c. 9. v. 14. c. 13. v. 15. 16. 17. 18. 19. 21. 22.

Numbers, c. 15. v. 32. c. 28. v. 9. 10. 17. 18. c. 29. v. 1.

Paley's Moral Philosophy. Book V. c. 5. 6. 7. 8. p. 272–288.

Pentecost, Greek for *fiftieth*. Lev. c. 23. v. 16.

Pontas, 415–426. 759–764.

Poph. 208.

Quintilian. Intentio. Depulsio.

Lord Raymond, 250. 705.

2 Lord Raymond, 1028.

Revelations, c. 1. v. 10.

1 Salk. 78. 79.

2 Salk. 626. 684.

3 Salk. 148.

Selden, 6.

1 Sellon, 336.

Sirmond, Councils of France, Vol. I. p. 300.

Spelman, Or. T. 75. 76. 77. 78. 79. 80. 81. 305.

Stephen. Restoration of the Laws of Edward the Confessor.

Str. 36. 702. 834.

1 Taunton 131.

1 Term Rep. 265. 266.

3 Term Rep. 642.

5 T. R. 25. 170.

7 T. R. 336.

8 T. R. 36.

Theodosian Code, c. 3. De Temporibus et Diebus Pacis.

1 Tidd, 39. 44. 193.

1 Vent. 293.

Wilberforce, Practical Christianity. c. 4. sect. 2. p. 142–146.

Wilk. Leg. Ang. Sax. 197. 292.

Willes, 459.

The second question, in this important case, is; *whether it is competent for this court to discharge the noble defendant on motion?*

There have been some English adjudications, in which, though an arrest has been deemed illegal, yet, the courts have refused to discharge the defendant; but have referred him to his action of trespass; or false imprisonment; reserving, also, the right of summary proceedings against the officer, by attachment.

These adjudications have all grown out of a single case, reported in the ancient year book of the eighteenth of Edward the Fourth, *placitum* nineteen.

In that case, the sheriff, in execution of a *fieri facias*, unlawfully, broke open an outer door; and, then, broke open a trunk, and took out the goods. It was held that trespass would not lie for the second act; that of breaking open the trunk, and taking out the goods.

On this decision, have been grounded those reported in Yelverton 29, 5 Coke. 92, 5 Modern 95, 6 Modern 96; and others. See, also, 2 Bl. Rep. 823. Buller 62. Cowper 1. 64. Cro. Jac. 485. 2 Esp. 227. 409. 539. Esp. N. P. Ca. 99. Hob. 62. 1 Salk. 78. 79. 626. 5 Ann. c. 9. 2 Dallas. 213. 1. Taunton 131 Nehem. c. 13. v. 15–22. 4 Bl. Comm. 63. 64. 10. 11. W. 3. c. 24. 11. 12. W. 3. c. 21. 2 G. 3. c. 15. 5. T. R. 449. 21. G. 3. c. 49. 34. G. 3. c. 61. 4. Bl. Comm. c. 33. Brackenridge L. M. 217. 218. 219. 220. Esp. on Ev. 15. 2 Inst. 220. Acts c. 18. v. 44. Lev. c. 19. v. 30. Ezek. c. 46. v. 3.

In the case in 1 Salkeld 78, it is decided; *"that false imprisonment lies for arrest on Sunday"*; but the report is silent respecting the discharge of the defendant.

In the case of Wilson *versus* Guttery, 5 Modern 95, *"the discharge of the defendant, who had been arrested on Sunday, was denied; and he was directed to bring an action of false imprisonment."*

In the case of Lidford *versus* Thomas, 6 Modern 96, the defendant was taken, without any warrant, on a Sunday, and kept, lock'd up, until Monday morning; and, then, a writ was obtained. The court do not appear to have granted the discharge of the defendant; but, with manifest animadversion, on the irregularity of the transaction, refer him to his remedy by false imprisonment; at the same time, directing an attachment, and pronouncing the officer liable to indictment.

The sentiment, expressed by Bacon, *that it seems the better opinion, that the killing an officer, who endeavors to arrest on an unlawful day, is not murder,* is not fully supported by the authority cited; for M^r Serjeant Hawkins merely states that, perhaps, if a bailiff arrest one on a Sunday, since the statute by which such arrest is made unlawful, the killing him may be manslaughter only. 4 Bacon 456. 1 Hawk. P. C. 130. See, also, Kely. 137. 1 Hale 457. 458. 5 Co. 93. 2 Hale 117. 470. Salk. 79.

Such an inference might, indeed, not be illegitimate, from the premises exhibited by Lord Coke, in his report of the case of Mackalley. It is, however, obvious, from the principles evolved by Lord Mansfield, in the case of Swann *versus* Broome, decided on the twenty eighth day of November 1764, and reported by Sir James Burrow, Vol. III, page 1595, that, if the question of the legality of an arrest on Sunday had then, for the first time, have arisen, almost the whole of the inferences deduced by Lord Coke, from the case of Mackalley, would have been shaken. How far resistance of the officer might have been palliated, or whether the execution of Mackalley might have been deemed, by his Lordship, justifiable, I will not pretend to say; but the elegant talents and sound judgment of Lord Mansfield would probably have been found in favor of the positions, *that arrest on Sunday, on civil process, would, at Common Law, be illegal; that the party is, yet, bound to obey the officer; and that, for a tortious arrest, there is remedy by action, and by*

*other means; and that the officer is liable to attachment, and to indictment;* remedies more consistent with humanity and moderation than that the party should take the important question of the legality of the arrest entirely into his own hands, and sacrifice the life of his fellow citizen. The enactment of Edward the Confessor is expressly declared by Lord Mansfield to be *a part of the Common Law;* and an arrest, on civil process, on Sunday, is, clearly, a violation of that PEACE, which is contemplated by the Roman, and by the Canonical law. And though the decision in the case of Mackalley, even, might not, in the present age, be deemed impregnable, it is, yet, pleasing to behold that tenderness of life, so honorable to the jurisprudence of England, prevailing at that early æra; nor is it preposterous to contrast the single mind of Lord Mansfield, enriched with the accumulated lore of a century and a half, against the twelve judges of England, in those more ancient days.

The principle, involved in the original decision of the ancient Year Book of Edward the Fourth, and, afterwards, supported in the case of Semaine, 5 Coke 92, and in others, is an extremely dangerous one, in a free country; in any country, where the laws are presumed to govern, and not the arbitrary volitions of men. It would be more dangerous in a republican government than in the kingdom from which it is derived. In the former, all the muniments of personal rights ought to be sacredly maintained; and not only ought an officer, committing a tortious act, to be liable to public prosecution, and to private action, and to summary proceedings for contempt; but the citizen should, also, be exposed to no disadvantage whatever from the commission of the original tort. Shall the PRIVATE INDIVIDUAL be prohibited from taking advantage of his own wrong; and shall the monstrous position be maintained that the PUBLIC OFFICER may do so? If I do not misapprehend the implication intended by Lord Mansfield, in the case of Lee *versus* General Gansell, in 1 Cowper 6, the principle meets his reprobation.

I am not bound, however, to touch this principle any farther; for, though I hold this court, on this part of the subject, at perfect liberty, under municipal statutes, to settle and regulate its own practice, unfettered by any extrinsic decisions whatever; yet the English authorities, when faithfully compared, fully sustain the competency of the court to discharge the defendant on motion.

In 1 Atkyns 152, Lord Hardwicke says: *"Where there is an irregular arrest, a court of law will discharge the defendant."*

In the case of Parker *versus* Sir William More, 6 Modern 95, Lord Holt observes: *"That the relief must be by* AUDITA QUERELA, *for the fact of the arrest being on Sunday is traversable."*

But the other judges hold the opposite doctrine, and say: *"If there were no more in it, we would relieve upon motion."*

And, in conformity with their opinion; *that the court may take notice that the arrest was upon a Sunday, without trial by the country,* are the following authorities: Cro. Eliz. 227., 1 Leo. 328., 6 Comyn 317., 4 Bacon 456.

In the present case, the court will, in like manner, take notice, *that the sixth day of September 1818, on which day the Earl of Selkirk was arrested, was Sunday.*

In the case of Lee *versus* General Gansell, 1 Cowper 9, Lord Mansfield says: "*The discharge of the party depends on his behavior. Gross misbehavior might induce the court to refuse it. The court, where a person is arrested, who has been attending its process, will interpose, not only, by punishing the officer; but, by discharging the prisoner out of custody. Cases of this sort are, always, matters of discretion.*"

Against this array of the highest authorities, stands, at last, opposed, the minute and solitary case of Wilson *versus* Guttery, in 5 Modern 95.

I am, therefore, of opinion, *that the Earl of Selkirk was illegally arrested, that he ought to be discharged, that the writ ought to be quashed, and the bail-bond cancelled.*

It is the judgment of the court, *that the defendant be discharged, the writ quashed, and the bail-bond cancelled.*

A. B. WOODWARD.

*Michigan; Tuesday, October 13ᵗʰ 1818.*